IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FREEDOM FROM RELIGION FOUNDATION, INC.,
PAUL WEINBAUM,
DR. MARTIN J. BOYD, and
JESSE V. CHAVEZ,

     Plaintiffs,

v.              CIV 05-1168 RLP/KBM

JOE R. WILLIAMS,
HOMER GONZALES, and
BILL SNODGRASS,
in their official capacities, and
CORRECTIONS CORPORATION OF AMERICA,

     Defendants.[1]

## MEMORANDUM OPINION AND ORDER
## ON PLAINTIFFS' MOTION TO COMPEL AND
## RE:  STIPULATED CONFIDENTIALITY ORDER ENTERED 6/21/06

Plaintiffs bring this action for declaratory and injunctive relief only, under 42 U.S.C.

§ 1983 for alleged First Amendment violations.  They assert that New Mexico's faith-based prison

programming violates the Establishment Clause, and seek to enjoin Defendants from continuing

the programs or from using any state funds to promote, endorse, or establish religion.  *See*

*Doc. 1.*   Plaintiffs' motion to compel is now ripe, *see Doc. 34,* and Defendants' response raises a

request for entry of a protective order, *see Doc. 38* at 5 & Exh. B.  I grant the motion to compel

in part and deny the request for as broad a protective order as that requested by Defendants.

---

[1]  The parties should take notice of the Plaintiffs and Defendants that remain after the Rule
41(a)(1) Notice, and adjust their captions accordingly.  *See Doc. 30.*

## I.  Background

According to the New Mexico Corrections Department website, the State has five "public" adult prisons and five "private" adult prisons.[2]  Corrections Corporation of America ("CCA") "operates" two of the private prisons – the New Mexico Women's Correctional Facility ("NMWCF") in Grants and the Torrance County Detention Center in Estancia.[3]  The New Mexico Corrections Department has "faith-based programs" at both its private and public prisons called the "Crossings" program.[4]  NMWCF has one such program – the so-called "God Pod."

---

[2] *See* http://corrections.state.nm.us/prisons/intro.html ("Adult Prisons is the largest division in the New Mexico Corrections Department (NMCD) with an overall FY03 budget of $165 million dollars for inmate management and control. There are a total of 6,200 incarcerated adults offenders.  These offenders are housed in 10 different facilities: 5 public prisons and 5 private facilities.  Security and non-security staff are responsible for providing humane, safe, secure and cost effective prison system.  The Director of Adult Prisons is ultimately responsible for the secure operation of all adult institutions, including inmate initiatives, health service requirements and quality of life issues.").

[3] The Corrections Department's website shows that the private prisons are "run by private contractors." http://corrections.state.nm.us/prisons/privateinst.html.  CCA's website says that it "owns" NMWCF and Torrance County.  *See* http://www.correctionscorp.com/facility_detailed.cfm?facid=165 (New Mexico Women's Correctional Facility . . . female Multi-Security CCA owned facility since June 89"); http://www.correctionscorp.com/facility_detailed.cfm?facid=135 ("Torrance County Detention Facility . . . male/female Multi-Security CCA owned facility since Dec-90").

[4]       Two of our faith-based volunteer ministries are providing innovative and effective programming that are increasingly receiving more attention by other Corrections Departments.  These are the Catholic mentor program coordinated by Sister Sue Reif and ***the Crossings faith-based living unit program found at five of our facilities*** coordinated by Executive Director and former New Mexico DOC Deputy Warden, Jan Thomas.  Information on the Crossings program can be found by clicking here.  Information on the Catholic Thresholds mentor program will be posted in the near future.

http://corrections.state.nm.us/programs/faith.html (emphasis added).  The "Crossings program" link goes to a volunteer page that indicates "several units in operation at the present time by Crossings Inc.," including the "private" prisons NMWCF and Lea County Correctional Facility, as well as the "public" prisons Southern New Mexico Correctional Facility; Roswell Correctional Center, and Central New Mexico Correctional Facility.  *See* http://corrections.state.nm.us/programs/volunteer.html#faith.

Defendant Joe Williams is the Secretary of Corrections and Defendant Homer Gonzales serves as the Department's Coordinator of Faith-Based Programs.  Defendant Bill Snodgrass, as the Warden at NMWCF, is by statute a state "corrections officer" for certain purposes, and here is sued in his official capacity and is represented by CCA's attorney.  *See* N.M. STAT. ANN. § 33-1-17(E) (LexisNexis 2004).

Document requests Plaintiffs have propounded to CCA and Warden Snodgrass are at issue here.  The parties have been cooperative thus far, which is greatly appreciated by the Court.  For the purpose of  facilitating the production of documents, for example, counsel for Plaintiffs and these Defendants stipulated to a confidentiality order.  They did so even though they disagree on the scope of Plaintiffs' Complaint and thus the relevancy of some discovery requests.  They also disagree on the breadth of an appropriate confidentiality order.  *See Doc. 41.*

As to the scope, Plaintiffs generally seek any CCA documents that relate to the "Institute in Basic Life Principles" ("IBLP"), and its "Life Principles Community/Crossings Program."  IBLP is one of the organizations CCA "partners" with to carry out prison religious programs.  *See Doc. 38,* at 14; *Doc. 39,* Exh. 3.  Plaintiffs seek CCA/IBLP "[i]nformation relating to ***other*** prisons operated by CCA," not just the New Mexico prisons.  *Doc. 35* at 4 (emphasis added).  The number of "other prisons" is potentially very large.  CCA describes itself as "the nation's largest owner and operator of privatized correctional and detention facilities and one of the largest prison operators in the United States, behind only the federal government and four states."[5]  A March 15, 2004 CCA news release, for example, provides:

> Inmates seeking spiritual direction as they strive to change their

---

[5]  *See* www.correctionscorp.com/news_release.cfm?news_id=27.

> lives will be the beneficiaries of a new agreement between
> Corrections Corporation of America (CCA) and the Chicago-based
> Institute in Basic Life Principles (IBLP).
>
> The two organizations have developed a voluntary, faith-based
> program of inmate rehabilitation that will be offered at eight CCA
> facilities this year.  ***The program could ultimately be expanded to
> serve inmates at all 64 CCA correctional facilities around the
> country.***

www.correctionscorp.com/news_release.cfm?news_id=27 (emphasis added).

At the core of this dispute, however, is how any produced CCA documents will be used.

CCA wants all documents, regardless of their content, to be held confidential and sealed in these

proceedings so that Plaintiffs cannot use the documents "in furtherance of future lawsuits

throughout the country against CCA and/or other prison providers" or to attract media attention.

*See Doc. 38* at 2-4, Exh. B.  Plaintiffs take the position that this case involves issues of public

concern. and they have been unwilling to stipulate that they will not disseminate the materials or

use them for future lawsuits.  *See Doc. 42* at 7-8; *see also Doc. 38* at 3.   I will first discuss the

appropriate scope of any protective order and then address the specifics of the discovery requests.

## II.  Protective Order

### A.  *Standard Of Review*

The applicable federal rule provides:

> **Upon motion** by a party . . . from whom discovery is sought,
> **accompanied by  a certification** that the movant has in good faith
> conferred or attempted to resolve the dispute without court action,
> and for good cause shown, the court .  . . may make any order
> which justice requires to protect a party . . . from annoyance,
> embarrassment, oppression, or undue burden or expense.

FED. R. CIV. P. 26(c) (emphasis added).  CCA failed to comply with the first two requirements of

a motion and certification.  Because opposing counsel overlooks the omission, so will I.

In general, "[c]onclusory or stereotypical assertions are insufficient to show good cause." *S.E.C. v. Dowdell,* 144 Fed. Appx. 716, 723 n.2 (10th Cir. 2005).[6]  "Instead, the party seeking a protective order must show that disclosure will result in a clearly defined and serious injury to the party seeking protection."  *Exum,* 209 F.R.D. at  206.  Thus, the burden is on CCA to show that disclosure of the information "will result in a clearly defined and serious injury to the party seeking protection," and

> [f]urther, the good cause requirement must be met even if the parties agree, in whole or in part, to a protective order.  *Bryan v. Eichenwald,* 191 F.R.D. 650, 652 (D. Kan. 2000) (citing *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.,* 178 F.3d 943, 944 (7th Cir. 1999)) (stating that the law requires a showing of good cause to seal any part of the record in a case because the public has a legitimate interest in all stages of a judicial proceeding).
>
> Generally, the "good cause" determination requires the court to balance the party's need for the information against the injury which might result from unrestricted disclosure.  *Pansy,* 23 F.3d at 787; *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d 1304, 1313 (11th Cir. 2001). The court should also consider privacy interests and whether the case involves issues important to the public.

*Id.*

### B.  CCA's Contentions

CCA first asserts that "whenever a prison or prison operator provides documentation to a third person . . . there is an inherent security issue related to some documents produced." *Doc. 38*

---

[6]  *See also e.g., Exum v. U.S. Olympic Committee,* 209 F.R.D. 201, 206 (D. Colo. 2002) (citing *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 n.16 (1981)); *Reed v. Bennett,* 193 F.R.D. 689, 691 (D. Kan. 2000) (same); *see also, e.g.,*; 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2035, at 484 & n. 32 (2d ed. 1994) (hereinafter "WRIGHT & MILLER").

at 2.  Yet CCA then declares that "***admittedly, such a concern would doubtfully apply to the materials provided to inmates in relation to the faith-based programming***."  *Id.* (emphasis added).  CCA's next asserted basis for the need of a nondisclosure agreement is equally dubious:

> much of the documentation to be produced is training materials ***prepared by <u>non-parties</u>***, which CCA uses in its faith-based housing program at NMWCF.  Training materials should not be disseminated and potentially misused by others who have not put in the effort to prepare or develop such materials.  Training materials have value to their creators when introduced in a classroom or organized setting.  However, once widely disseminated outside the organized structure intended, the materials lose value and may be misused.

*Id.* (emphasis added).  CCA's attempt to raise a "competitive advantage" or "trade secret" type of argument on behalf of unknown others is weak at best.[7]

Rather, CCA's real concerns, as noted earlier, lie in the filing of other similar suits following public disclosure.  Plaintiff Freedom From Religion Foundation, Inc. is in the business of filing First Amendment cases, and counsel for Plaintiffs declined to agree to a confidentiality order that would prevent dissemination of information to outside parties and prevent use of the information in future lawsuits.  *Id.* at 3.  Defendants further fear that a failure to keep all documents confidential will prompt the media to cover and "influence" the case.  *Id.*  Finally, the breadth of Defendants' proposed confidentiality agreement prevent any outsider from ever learning of the contents of CCA's documents produced in discovery.  It requires that every document submitted to the Court be under seal and returned at the end of the litigation.  Its nondisclosure terms are to operate in perpetuity.  *See, e.g., id.,* Exh. B at ¶¶ 4, 7, 9.

---

[7]  A "party may not ask for an order to protect the rights of another party or witness if that party or witness does not claim protection for himself."  WRIGHT & MILLER, § 2035 at 475.

CCA argues that "[t]he U.S. Supreme Court has emphasized that the discovery process is not a forum traditionally open to the public, and no first amendment rights are attached to the discovery process." *Doc. 38* at 4. For this proposition, Defendants rely on *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S. Ct. 2199, 2208 (1984) and *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1118 (3rd Cir. 1986). For the reasons below, I find CCA's legal position overstated and unsupported for several independent reasons. I also find the factual bases for a sweeping protective order are conclusory at best.

### C. <u>Seattle Times</u> & <u>Cipollone</u> Do Not Require The Imposition Of A Sweeping Protective Order

Although pretrial discovery is traditionally conducted in private, court proceedings rarely operate in secrecy. Absent a sufficiently good reason to do so, parties to litigation can disseminate information they obtain in discovery, and the public has access to documents filed, placed into evidence or used by the court in reaching a decision.[8] As noted by the Sixth Circuit,

> [w]hile District Courts have the discretion to issue protective orders, that discretion is limited by the careful dictates of Fed.R.Civ.P. 26 and "is circumscribed by a long-established legal

---

[8] Conversely, a court cannot compel a party to disseminate information or to file documents so that they becomes part of the public record. *See Seattle Times,* 467 U.S. at 33-34 & n. 19; *Wyeth Laboratories v. United States Court for the District of Kansas,* 851 F.2d 321, 324 & n.3 (10th Cir. 1988) ("We are thus constrained to hold in establishing the ['Wyeth Laboratory DTP Discovery Library'], the district court acted without authority. . . . Of course, to the extent that papers are on file in the unsealed or unprotected records of the court, they are open to the public. Our holding does not affect these documents. We simply take the position that the district court is without authority to add to these files."); *Oklahoma Hosp. Ass'n v. Oklahoma Publishing Co.,* 748 F.2d 1421, 1424 (10th Cir. 1984), *cert. denied,* 473 U.S. 905 (1985) ("While it may be conceded that parties to litigation have a constitutionally protected right to disseminate information obtained by them through the discovery process absent a valid protective order, . . . it does not follow that they can be compelled to disseminate such information."); *see also Wilk v. American Medical Assoc.,* 635 F.2d 1295, 1299 (7th Cir. 1981); *Exum,* 209 F.R.D. at 205 & n. 3 (and additional cases cited therein); *Frankl v. Goodyear Tire & Rubber Co.,* 181 N.J. 1, ___, 853 A.2d 880, 886-887 (N.J. 2004) ("some legal scholars suggest a need to revisit the notion that unfiled discovery documents are insulated from public access," and discussing the debate on the subject).

> tradition" which values public access to court proceedings.  *Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1177 (6th Cir. 1983), *cert. denied,* 465 U.S. 1100 (1984).  Rule 26(c) allows the sealing of court papers only "for good cause shown" to the court that the particular documents justify court-imposed secrecy.

*Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir. 1996) ("*P&G Co.*").

Thus, when entering a confidentiality order, a district court cannot "abdicate[] its responsibility to oversee the discovery process and to determine whether filings should be made available to the public."  *Estate of Trentadue ex rel. Aguilar v. United States,* 397 F.3d 840, 865 (10th Cir. 2005) (quoting *P&G Co.,* 78 F.3d at 227).  To permit the parties to "adjudicate their own case based upon their own self-interest . . . is a violation not only of Rule 26(c) but of the principles so painstakingly discussed in *Brown & Williamson.*"  *P&G Co.,* 78 F.3d 227.[9]

Neither *Seattle Times* nor *Cipollone* hold otherwise.  Contrary to CCA's interpretation of the opinion, *Seattle Times* specifically noted that "information obtained through civil discovery authorized by modern rules of civil procedure would rarely, if ever, fall within the classes of unprotected speech identified by decisions of this Court."  *Seattle Times*, 467 U.S. at 31.  Such First Amendment protections in the discovery process are not without limitations, however.  The *Seattle Times* opinion addressed the issue of

> whether a litigant's freedom comprehends the right to disseminate information that he has obtained pursuant to a court order that both granted him access to that information and placed restraints on the

---

[9]  Indeed, the confidentiality order in the *Proctor & Gamble* case amounted to almost complete "abdication" by the court.  "It certainly should not turn this function over to the parties, as it did here, allowing them to modify the terms of a court order without even seeking the consent of the court.  The protective order in this case allows the parties to control public access to court papers, and it should be vacated or substantially changed."  *Id.*

> way in which the information might be used. In addressing that
> question it is necessary to consider whether the "practice in
> question [furthers] an important or substantial governmental
> interest unrelated to the suppression of expression" and whether
> "the limitation of First Amendment freedoms [is] no greater than is
> necessary or essential to the protection of the particular
> governmental interest involved."

*Id.* at 32 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974).

The *Seattle Times* case involved plaintiffs from an unusual and no doubt unpopular religious group who had been the subject of several unflattering newspaper articles.  The state court, imposing state discovery rules, entered a protective order keeping the newspaper defendants from publishing, disseminating, or using information gained solely through the discovery process regarding personal and financial information for members, contributors and clients of the religious organization.  The state court held that the restriction on publishing was reasonable to avoid the chilling effect that dissemination would have on a party's willingness to bring suit for defamation.  *See Seattle Times,* 467 U.S. at 22-27.  Thus, the public interest in "knowing more about" the religious organization, did not bestow on the newspapers an "***unrestrained*** right to disseminate information that has been obtained through pretrial discovery." *Id.* (emphasis added).

The Court therefore rejected the broad proposition that the "First Amendment imposes strict limits on the availability of any judicial order that has the effect of restricting expression," as an "unwarranted restriction the duty and discretion of a trial court to oversee the discovery process." *Id.*  It discussed the "unique position [protective orders] occupy in relation to the First Amendment."  Specifically, the Court noted that typically discovery is not open to the public and highlighted the distinction between pretrial discovery information, much of which may never be

admitted into evidence, and information submitted in the court record, which is "a traditionally public source of information." *Id.* at 33.

Significantly, the Supreme Court did not disturb the state decision finding "good cause," and held that the First Amendment is not offended if a "protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information gained from other sources." *Id.* at 37. As the Tenth Circuit has observed, the Supreme Court decision in *Seattle Times* "does not address the showing required to establish good cause. On the contrary, the Supreme Court noted that 'Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required.'" *Hutchinson v. Pfeil,* 1999 WL 1015557 at *6 (10th Cir. 1999).

True, the Third Circuit made sweeping statements about *Seattle Times* vis-a-vis the First Amendment in its *Cipollone* decision.[10] It did so, however, in the context of determining that the district court erroneously construed the *Seattle Times* decision as substituting a "least restrictive means" test for the "good cause" standard under Rule 26(c). *See* 785 F.2d at 1118-20. The Third Circuit then remanded the case cautioning that the "good cause" determination must be based on a specific need for protection from a significant harm "not a mere trifle," and that "umbrella" protective orders may not be suitable in all instances. *Id.* at 1121-23.

### D. CCA Fails To Meet Its Burden For Entry Of A Protective Order

In my view, CCA has not clearly defined a serious injury sufficient to justify the imposition

---

[10] *Cipollone* addressed the appropriateness of a protective order preventing dissemination of documents to the public or counsel in other tobacco litigation cases, and return of the documents at the close of litigation.

of the sweeping protective order.  The possibility of future lawsuits and media attention are

conclusory and speculative, and on their face do not demonstrate the requisite seriousness to

justify a protective order of such a sweeping magnitude.[11]  *See Bryan v. Eichenwald,* 191 F.R.D.

650, 652-63 (D. Kan. 2000).  In fact, CCA cites no decision holding that a broad protective order

is justified for any of the cited reasons.  My research has revealed that the asserted reasons, even

if sufficiently fact-specific, are not sufficient good cause.  *See, e.g., Condit v. Dunne,* 225 F.R.D.

113, 115 (S.D.N.Y. 2004).  I find those decisions persuasive.[12]

Sixteen years ago, the Tenth Circuit noted that "blanket" or "umbrella" protective orders

"are becoming standard practice in complex cases" because they "allow the parties to make full

disclosure in discovery without fear of public access to sensitive information and without the

---

[11]  Even if a protective order were imposed, it would not necessarily keep CCA's information from others for use in future lawsuits.  The Tenth Circuit subscribes to the view that information subject to protective orders can be disclosed to proper collateral litigants to "avoid[] duplicative discovery."  *United Nuclear,* 905 F.2d at 1428 (adopting approach taken by the Seventh Circuit in *Wilks, supra,* note 6); *see also e.g,. Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110, 125 (2ⁿᵈ Cir. 2006) (prior reliance on protective order not sufficient to preclude overriding it and disseminating information).

[12]  *See, e.g., Constand v. Cosby,* 229 F.R.D. 472, 480 (E.D. Pa. 2005) ("Embarrassment alone, however, even if serious, does not justify the cloak of confidentiality over all discovery in this case. Defendant, as the party seeking protection, must show a nexus between the potential for serious embarrassment and the particular information sought to be kept confidential. In other words, it does not necessarily follow that because some of the information disclosed during discovery will cause embarrassment to defendant, all the discovery should be subject to a protective order. . . ."); *Condit,* 225 F.R.D. at 118 ("Even assuming part or all of the video is disseminated to the public, memories fade and . . . any tainting of the jury pool can be remedied through voir dire."); *Stalnaker, v. Norar Corporation,* 293 F. Supp. 2d 12601264 (M.D. Ala. 2003) (refusing to seal an FLSA wage settlement because it did not contain trade secrets, informants, children, or scandalous or libelous information; "business's general interest in keeping its legal proceedings private does not overcome the presumption of openness"); *Federal Trade Commission v. Digital Interactive Assocs., Inc.,* 1996 WL 912156 (D. Colo. 1996) ("Defendants have made no showing that plaintiff is conducting discovery in the instant case solely to assist litigation in a foreign forum.  Absent such a showing, defendants' assertion of 'unfair advantage,' without more, does not meet the 'good cause' requirement for entry of a protective order under Rule 26 (c) to enforce the parties' confidentiality agreement.").

expense and delay of protracted disputes over every item of sensitive information." *United Nuclear Corp. v. Cranford Ins. Co.,* 905 F.2d 1424, 1427 (10th Cir. 1990), *cert. denied sub nom., American Special Risk Ins. Co. v. Rohm & Haas Co.,* 498 U.S. 1073 (1991).  Although an umbrella order "makes the discovery process in a particular case operate more efficiently," the Tenth Circuit has not countenanced the use of umbrella protective orders simply because they can make work easier for the Court.  *Id.* at 1424-25.  Other courts hold that in cases such as this one which is not complex, umbrella orders should not used, particularly when there is little, if any, showing of good cause.[13]

Especially in a case such as this where the general public has a significant interest in how prisons are run, a litigant's private interests pale by comparison.  *Condit,* 225 F.R.D. at  118 (Dominick Dunne's deposition in Gary Condit's defamation suit); *Felling v. Knight,* 211 F.R.D. 552 (S.D. Ind. 2003) (Coach Knight's termination).  Nevertheless, this district and the federal judiciary generally have generated privacy policies identifying the types of information that should

_____

[13]  *See Shingara v. Skiles,* 420 F.3d 301, 308 (3rd Cir. 2005) (though *Cipollone* commended the use of umbrella protective orders in complex cases, it also cautioned that there may be cases where a document-by-document approach would be preferable); *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.,* 178 F.3d 943, 945-46 (7th Cir. 1999) (the protective order entered was "so loose that it amounts, as we suggested at the outset, to giving each party carte blanche to decide what portions of the record shall be kept secret. Such an order is invalid. . . .  We are mindful of the school of thought that blanket protective orders ("umbrella orders"), entered by stipulation of the parties without judicial review and allowing each litigant to seal all documents that it produces in pretrial discovery, are unproblematic aids to the expeditious processing of complex commercial litigation because there is no tradition of public access to discovery materials. . . .  The weight of authority, however, is to the contrary. Most cases endorse a presumption of public access to discovery materials . . . and therefore require the district court to make a determination of good cause before he may enter the order. . . .  Rule 26(c) would appear to require no less. And we note that both the First and Third Circuits, which used to endorse broad umbrella orders (e.g., *Cryovac, Cipollone*), have moved away from that position ( *Public Citizen, Glenmede, Pansy, Leucadia*). . . .").

be redacted or filed under seal.[14]  The Court also is sensitive to prison security matters and routinely permits prison officials to redact portions of a *Martinez Report* and to file such information under seal so that it is not made public.  *See, e.g., Pryce v. Cooper,* CIV 05-1021 (*Doc. 33* at 8).

After reviewing this opinion and the judiciary and district's privacy policies, I expect the parties to work together to identify the information that is related to prison security or other matters that should be kept confidential and subject to a protective order.  I ask that the parties confer and submit another agreed protective order in this regard, and will not strike the overbroad Stipulated Confidentiality Order until they do so.[15]

## III.  Discovery Requests

### A.  Standard of Review For Motion To Compel

Defendants' interpret FED. R. CIV. P. 26 to require Plaintiff to show good cause to prevail on their motion to compel.  They read Rule 26 too narrowly.  The first sentence of the Rule provides the basic rule of discovery, that parties "may obtain discovery regarding any matter, not

---

[14]   *See* http://www.privacy.uscourts.gov/Policy.htm (judiciary policy); http://www.nmcourt.fed.us/web/Shared%20Files/privpol.htm (D.N.M. privacy policy); http://www.nmcourt.fed.us/web/Shared%20Files/NoticeOfEAvailability.pdf (D.N.M. document explaining what should be redacted) (can be accessed directly by pasting this link into a browser or by clicking the "AMENDED PRIVACY POLICY AND PUBLIC ACCESS TO ELECTRONIC FILES FOR THE U.S. DISTRICT COURT" hyperlink in the District's Privacy Policy).

[15]   The very case that Plaintiffs rely upon – *Americans United for Separation of Church and State v. Prison Fellowship Ministries,* ___ F. Supp. 2d ___, 2006 WL 1523092 (S.D. Iowa) – operated under a confidentiality order that defined confidential information as information the Department of Corrections was required to keep confidential by law, an individual's personal or financial information that replicates the federal judiciary's privacy policy, other information that the parties agreed was confidential, and any information that the Court ordered treated as confidential after motion and showing of good cause.  *See* Case 4:03-cv-90074-RP-TJS (*Doc. 55*, not sealed and available on the court's CM/ECF system through the federal judiciary's PACER program).

privileged, that is relevant to the claim or defense of any party."  FED. R. CIV. P. 26(b)(1).  The

Rule then goes on to outline the circumstances where even broader discovery is warranted: "***For***

***good cause,*** the court may order discovery of any matter relevant to the subject matter involved

in the action."  *Id.* (emphasis added).[16]

A relatively recent decision out of the District of Kansas held that if discovery is relevant

on its face, the party opposing production bears the burden to show either lack of relevance or

marginal relevance with potential harm that outweighs the presumption of disclosure.  If,

however, the relevancy of the documents sought is not plain, then the party seeking discovery

would have the burden to show relevancy.[17]  Under either test, Plaintiffs have demonstrated the

information they seek is discoverable under FED. R. CIV. P. 26(b)(1).  *See Doc. 35* at 5-14.

### B.  *Plaintiffs' Complaint Is Not Limited To NMWCF Or CCA/IBLP Programs*

Defendants object to Request Numbers 6, 9, 29, 30, 31, and 70 on the premise that this

---

[16]   *See also id.* (2000 Amendment Advisory Committee Note) ("Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defense, the court would become involved to determine whether the discovery is relevant to the claims or defense and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.").  The cases cited by Defendants [*Centurion Industries, Inc. V. Warren Steurer & Associates,* 665 F.2d 323 (10th Cir. 1981) and  *Johnson ex rel. Johnson v. Oalthe Dist. Schs.,* 212 F.R.D. 582, 586 (D.Kan. 2003)] in support of a "good cause" burden on Plaintiffs for production of documents relate not to the relevance inquiry but to FED. R. CIV. P. 26(c)(7) regarding protective orders for trade secrets and the like.

[17]   "Courts have long held that the burden is on the objecting party to show why an interrogatory is improper and while the burden is on the moving party to seek court action, the burden of persuasion remains at all times with the objecting party."  *Williams v. Sprint/United Management Co.,* 2005 WL 731070 at *4 (D.Kan. 2005) (citing 8A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2173, at 291-93 (2d ed. 1994).  The *Williams* court also relied on *PAS Communications, Inc. v. Sprint Corp.*, 139 F. Supp.2d 1149, 1159 (D.Kan. 2001) for the proposition that "where discovery sought appears relevant, [the] party resisting discovery bears the burden of establishing lack of relevance."  *See also E.g., Simpson v. University of Colo.,* 220 F.R.D. 354, 359 (D. Colo. 2004).

14

lawsuit challenges only the faith-based program at NMWCF, and therefore discovery should be confined to that institution.  *See Doc. 38* at 6-16.  A plain reading of the Complaint, however, shows that Plaintiffs challenge the New Mexico Correction Department's "state-wide" "faith-based programming," ¶¶ 26-34, 54-62, the "most intensive" of which is "presently conducted at the NMWCF" in the form of an "exclusively faith-based segregation pod," *id.,* ¶¶ 32, 34, otherwise known as "the God Pod," *id.* ¶ 47.  Moreover, Plaintiffs want defendants to discontinue "***any*** faith-based programming," not just the "faith-based segregation unit at the NMWCF."  *Id.* at 12, Request for Relief (b) (emphasis added).

Thus, Plaintiff's citation to the situation at NMWCF seems but one illustration of the alleged  state-wide faith-based program rather than the sole basis for their Complaint.  Since specifically seek an injunction halting the program at NMWCF, the warden of that facility in his official capacity is an entirely appropriate defendant.  Accordingly, any documents being withheld solely on this theory must be produced.

### C.  Permissible Scope of Discovery

Information regarding CCA's IBLP partnership and faith-based rehabilitation programs in New Mexico correctional facilities is obviously relevant given my reading of the Complaint. However, of the three CCA-operated facilities in New Mexico, one is a federal prison for which no New Mexico tax dollars are implicated. *Doc. 38* at 8.  Defendants also contend that requests for information about faith-based programs at CCA-run prisons outside the state of New Mexico are overly broad and "clearly outside the scope of the subject matter of this litigation," *id.* at 7.[18]

---

[18]   For reasons that are not clear from the briefing, Defendants' objections do not cover every request for CCA documents that involve faith-based programs in other prisons.

Because New Mexico contracts some prison services, there are necessarily two overlapping Defendants in this case – state defendants and private defendants acting on behalf of the state in the prisons.  Thus, any faith-based programming within New Mexico is relevant and should be produced if CCA has it, regardless of whether the facility is a CCA-run facility or a state-run facility.

On the other hand, although the specifics about CCA programs in non-New Mexico facilities may be relevant to CCA's programs and intent as discussed below, such information is far afield of the litigation that this Court is responsible for resolving.  Therefore, I will limit such requests to the name of the facility, the name of the prison coordinator for the program, whether the program is substantially the same as that at NMWCF, and, if not, a brief description of the differences in the programs.  CCA must make these disclosures for the other eight facilities where, according to its website, it will offer or has offered IBLP faith-based programs.  It must also identify, by name of the facility only, which of the other 64 facilities where it plans to implement the same or similar programs.

### D.  CCA's "Intent"

Defendants contend that as a private corporation, CCA's "intent" or "purpose" is irrelevant to determining whether New Mexico is violating the First Amendment.  *Doc. 38* at 12-14.  They characterize the suit as solely challenging whether New Mexico – a governmental entity – violates the First Amendment.  At the very least, Defendants argue, CCA's intent is only relevant to its implementation of faith-based programs in New Mexico.  *See id.* at 10.  As such,

Defendants contend certain CCA documents[19] should not be produced.

Simply put, I agree with Plaintiffs that discovery relating to CCA's intent is sufficiently calculated to lead to admissible evidence that could be relevant at trial. Defendants acknowledge that under the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), a program's non-secular "[p]urpose, therefore, may be relevant." *Doc. 38* at 14. I am unpersuaded that it would be appropriate for me to address Defendants' arguments that Establishment Clause decisions such as *Agostini* should limit possible relevance at this stage of the litigation. *See Agostini v. Felton*, 521 U.S. 203 (1997).[20]

Finally, even assuming that CCA will be dismissed in the future on some legal ground, Rule 26 allows discovery of "any matter relevant the subject matter involved in the action" for good cause. In my view, the allegedly unclear legal status of private prison corporations given the State's constitutional obligations in carrying out prison functions constitutes good cause for the

---

[19]   All together, these arguments encompass Requests Nos. 5, 6, 8 (in part), 9, 13, 15, 29, 30, 31, 40, 41, 45, 54 (in part), 61, 62, 63, 64, 65, 67, 68, 69, and 74. *See Doc. 38* at 12, 14. Except for one, these requests duplicate the requests objected to on the ground that only NMWCF is at issue. *See id.* at 8 (6, 9, 29, 30, 31, and 70).

[20]   Even if it were appropriate to consider these purely legal issues in the present discovery dispute, nothing in the record before me conclusively demonstrates as a matter of law that New Mexico's "Crossings" program is religion-neutral, CCA's faith-based programs are religion-neutral or the program is financial aid that goes to "citizens" who in turn spend the funding in a religious setting. By the same token, nothing in the record establishes that CCA is in the position of the "broad class of individuals" who incidentally direct the financial "aid" they receive directly from "neutral government programs" into "religious schools or institutions of their own choosing." *Id.* at 649. Indeed, this latter argument is one for the *state* defendants to raise, which they have not. Further, I note that courts have struck down state-funded or sponsored faith-based initiatives in the penal setting. *See Americans United for Separation of Church and State v. Prison Fellowship Ministries,* ___ F. Supp. 2d ___, 2006 WL 1523092 (S.D. Iowa); *Freedom from Religion Foundation, Inc. v. McCallum,* 179 F. Supp. 2d 950 (W.D. Wisc. 2002); *see also Teen Ranch v. Udow,* 389 F. Supp.2d 827 (W.D. Mich. 2005) (upholding state moratorium on funding of faith-based private company providing youth residential services under contract with the State).

discovery to be had from CCA at this juncture.

### E. Argument In Footnote

In a footnote, Defendants argue that Plaintiffs have not "explained the relevance of prior contracts [between CCA and New Mexico] and therefore [Request 70] should be denied." *Doc. 38* at 8 n.1. This matter is not sufficiently briefed and I will not rule on it. In light of the above rulings, I expect the parties can work out their differences on the issue.

Wherefore,

**IT IS HEREBY ORDERED AS FOLLOWS:**

1. Defendant's "request" for a protective order as tendered is **denied**, *see Doc. 38* at 5 & Exh. B;

2. The present confidentiality order *(Doc. 41)* remains in effect until the parties submit another confidentiality order or notice that they will not be submitting any such order. They should do so by Friday, August 25, 2006; and

3. Plaintiffs' motion to compel CCA and Warden Snodgrass to produce documents is **granted in part and denied in part, as set forth above**.

_____
UNITED STATES MAGISTRATE JUDGE

18